# Exhibit A

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Yury A. Kolesnikov (SBN 271173)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:   (858) 914-2001
Facsimile:    (858) 914-2002
E-mail:        fbottini@bottinilaw.com
                    achang@bottinilaw.com
                    ykolesnikov@bottinilaw.com

*Attorneys for Plaintiff*

**F I L E D**
**SAN MATEO COUNTY**

MAR 1 0 2016

Clerk of the Superior Court

By _____
              DEPUTY CLERK

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN MATEO

| | |
|---|---|
| MIKA CAHOJ, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NATERA, INC., MATTHEW RABINOWITZ, JONATHAN SHEENA, HERM ROSENMAN, ROELOF F. BOTHA, TODD COZZENS, EDWARD C. DRISCOLL, JR., JAMES I. HEALY, JOHN STEUART, SC XII MANAGEMENT, LLC, SEQUOIA CAPITAL XII, LP, LIGHTSPEED ULTIMATE GENERAL PARTNER VIII, LTD., LIGHTSPEED VENTURE PARTNERS VIII, LP, MORGAN STANLEY & CO. LLC, COWEN AND COMPANY, LLC, PIPER JAFFRAY & CO., ROBERT W. BAIRD & CO. INCORPORATED, WEDBUSH SECURITIES INC., and DOES 1-25, inclusive,<br><br>Defendants. | ) Case No. CIV537717<br>)<br>) CLASS ACTION<br>)<br>) COMPLAINT FOR VIOLATIONS OF<br>) THE SECURITIES ACT OF 1933<br>)<br>)      BY FAX<br>)<br>) DEMAND FOR JURY TRIAL<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

SHAREHOLDER CLASS ACTION COMPLAINT

1    Plaintiff, individually and on behalf of all others similarly situated, by plaintiff's
2  undersigned attorneys, for plaintiff's complaint against defendants, alleges the
3  following based upon personal knowledge as to plaintiff and plaintiff's own acts, and
4  upon information and belief as to all other matters, based on the investigation
5  conducted by and through plaintiff's attorneys, which include, among other things, a
6  review of Natera, Inc. ("Natera" or the "Company") press releases, Securities and
7  Exchange Commission ("SEC") filings, analyst and media reports and other
8  commentary analysis, and information concerning Natera and the industry within
9  which it operates. Plaintiff's investigation into the matters alleged herein is
10  continuing and many relevant facts are known only to, or are exclusively within the
11  custody and control of, the defendants. Plaintiff believes that substantial additional
12  evidentiary support will exist for the allegations set forth herein after a reasonable
13  opportunity for formal discovery.

14                    **NATURE AND SUMMARY OF THE ACTION**

15    1.    This is a securities class action for violations of §§11, 12(a)(2) and 15 of
16  the Securities Act of 1933 (the "Securities Act") on behalf of all purchasers of Natera
17  common stock in and/or traceable to the Company's July 2, 2015 initial public offering
18  ("IPO") against (1) Natera; (2) certain of Natera's senior executives and directors who
19  signed the June 1, 2015 Registration Statement issued in connection with Natera's
20  IPO of 10.9 million shares of common stock (including exercise of the over-allotment
21  option) (the "Offering"); (3) certain controlling entities of Natera that owned
22  approximately 31% of the Company's outstanding securities; and (4) each of the
23  underwriters of the Offering.  Plaintiff alleges that the Registration Statement and
24  Prospectus incorporated therein (collectively, the "Registration Statement") issued in
25  connection with the IPO contained materially incorrect or misleading statements
26  and/or omitted material information that was required to be disclosed.  Natera is
27  strictly liable for such misstatements and omissions therefrom, as are the defendants
28  who signed the Registration Statement, the underwriters, and the controlling entities

1

SHAREHOLDER CLASS ACTION COMPLAINT

1   and persons.  Plaintiff expressly disclaims any allegation that could be construed as
2   alleging fraud or intentional or reckless misconduct.

3       2.      Natera is a genetic testing company that develops and commercializes
4   non-invasive methods for analyzing DNA. Natera's primary product is Panorama, a
5   non-invasive prenatal test ("NIPT"), launched in March 2013, which the Company
6   claims is the "most accurate NIPT commercially available in the United States."
7   Natera went public on July 2, 2015 at an IPO price of $18 per share, and quickly
8   traded up to close its first day of public trading at $22.74 per share.  The Company's
9   common stock is listed and trades on the NASDAQ stock exchange under the ticker
10  symbol "NTRA."

11      3.      The offering materials contained materially false statements and
12  omissions, including the failure to disclose that Natera had experienced a nearly $20
13  million net loss in the Company's second quarter 2015 ("2Q 15") – which had ended
14  before the IPO – and which loss exceeds any other quarterly loss the Company had
15  suffered by as much as 3700% since at least Q2 2013 when Panorama was released.
16  In addition, Natera had experienced a Q2 2015 revenue decline, which was also the
17  second quarter in a row of declining revenue - contrary to the state of Natera's
18  business depicted in the Registration Statement.  In fact, Panorama tests accessioned
19  in which revenue was recognized had already flat-lined at 28,000+ tests, and the
20  percent of Panorama tests accessioned in which revenue was recognized in the same
21  quarter had dramatically declined to a mere 47%, far below the percentage in prior
22  quarters, indicating bleak prospects for the Company's principal product – far from
23  what was portrayed in the Registration Statement and roadshow for the Offering.[1]

24      4.      On February 8, 2016, Natera stock closed at $6.61 per share, a more than
25  63% decline from the IPO price, having plummeted in response to information

26

27      [1] A test is accessioned when Natera receives the test, the relevant information
    about the test is entered into its computer system and the test sample is routed into
28  the appropriate sample flow.

- 2 -

SHAREHOLDER CLASS ACTION COMPLAINT

1 | reflecting the materialization of significant risks misrepresented and omitted from the
2 | Registration Statement as alleged herein.

3 | <center>**JURISDICTION AND VENUE**</center>

4 |     5.     This Court has subject matter jurisdiction over this action pursuant to
5 | the California Constitution, Article VI, §10, and §22 of the Securities Act, 15 U.S.C.
6 | §77v.  Section 22 of the Securities Act expressly states that "[e]xcept as provided in
7 | section 16(c), no case arising under this title and brought in any State court of
8 | competent jurisdiction shall be removed to any court of the United States."  Section
9 | 16(c) refers to "covered class action[s] brought in any State court involving a covered
10 | security, as set forth in subsection (b);" and subsection (b) of §16 in turn includes
11 | within its scope only covered class actions "based upon the statutory or common law of
12 | any State or subdivision thereof."  *See* 15 U.S.C. §77p.  This action only asserts federal
13 | law claims under §11, §12(a)(2) and §15 of the Securities Act.  *See* 15 U.S.C. §77k,
14 | §77l(a)(2), and §77o.  Consequently, this action is not removable to federal court.  *See*
15 | *Kircher v. Putnam Funds Trust,* 547 U.S. 633, 643-44 (2006); *Madden v. Cowen & Co.,* 576
16 | F.3d 957, 965 (9th Cir. 2009); *Luther v. Countrywide Home Loans Servicing LP,* 533 F.3d
17 | 1031, 1033-34 (9th Cir. 2008).

18 |     6.     This Court has personal jurisdiction over each defendant named herein
19 | because each conducted business in, resided in, and/or was a citizen of California at
20 | the time of the Offering.

21 |     7.     Venue is proper in this Court because many of the acts complained of,
22 | including the preparation and dissemination of the materially inaccurate, misleading
23 | and incomplete Registration Statement and Prospectus (which were prepared by
24 | defendants, or with their participation, acquiescence, encouragement, cooperation
25 | and/or assistance), occurred in whole or in substantial part in this County.  Natera's
26 | headquarters is in this County and eight additional defendants, including three
27 | individual defendants, reside or have offices in this County.

28 |

<center>3</center>

SHAREHOLDER CLASS ACTION COMPLAINT

**PARTIES**

8.     Plaintiff Mika Cahoj purchased shares of Natera common stock pursuant or traceable to the Offering (on or about July 7, 2015), and was damaged thereby.

9.     Defendant Natera issued the securities sold in the IPO and is a Delaware corporation with principal executive offices in San Mateo County at 201 Industrial Road, San Carlos, California.  Natera is subject to liability as an issuer and control person, and all the statements and solicitations herein made by Natera's officers were on behalf of Natera.  Natera designated numerous personnel on the working group for the IPO, including its Chief Executive Officer ("CEO"), Chief Technology Officer ("CTO"), and Chief Financial Officer ("CFO"), all of whom not only reviewed and approved the offering documents, but also traveled in a roadshow, and gave roadshow presentations according to a PowerPoint and talking points/script that was reviewed and approved by them and other Natera personnel.  Natera's representatives at the roadshow pitched investors in the IPO in webcasts and meetings.

10.     Defendant Matthew Rabinowitz is a co-founder and President of Natera and has served as CEO since 2005 and as Chairman since May 2015. As one of three Natera executives in the IPO working group, Rabinowitz reviewed and approved, and participated in making, statements in the Registration Statement.  He also reviewed, edited and approved the IPO's roadshow PowerPoint presentation and roadshow talking points and script, in addition to participating in making the false and misleading statements at the roadshow as Natera's CEO. Rabinowitz was motivated by the financial implications of an IPO for Natera and its then-private shareholders, including (but not limited to) officers and employees of the Company.  Immediately before the IPO, defendant Rabinowitz beneficially owned over 5.7 million Natera shares, providing him with 11.5% voting control after the IPO and over $104 million in marketable securities as of the close of the IPO.  Those securities included over 1.2 million shares of Series A-1 Preferred Stock that automatically converted to Natera common stock on a one-for-one basis immediately prior to the close of the IPO. Those

SHAREHOLDER CLASS ACTION COMPLAINT

1   securities also included options for over 2.1 million underlying marketable common

2   shares, with exercise prices between $0.55 and $5.39 per share, that vested in

3   connection with or at or about the time of the IPO, and that were "in-the-money" with

4   an intrinsic value of approximately $33 million as of the IPO's close.

5        11.   Defendant Jonathan Sheena is a co-founder of Natera and has served as

6   CTO and a director since 2007.  As one of three Natera executives in the IPO working

7   group, Sheena reviewed and approved, and participated in making, statements in the

8   Registration Statement.  He also reviewed, edited and approved the IPO's roadshow

9   PowerPoint presentation and roadshow talking points and script, in addition to

10  participating in making the false and misleading statements at the roadshow as

11  Natera's CTO. Sheena was motivated by the financial implications of an IPO for

12  Natera and its then-private shareholders, including (but not limited to) officers and

13  employees of the Company. Immediately before the IPO, defendant Sheena

14  beneficially owned over 1.8 million Natera shares, providing him with 3.7% voting

15  control after the IPO and with over $33.4 million in marketable securities as of the

16  close of the IPO. Those securities included options for over 1.2 million underlying

17  marketable common shares, with exercise prices between $0.44 and $2.65 per share,

18  that were fully vested at or about the time of the IPO, and that were "in-the-money"

19  with an intrinsic value of over $20 million as of the IPO's close.

20       12.   Defendant Herm Rosenman has served as Natera's CFO since February

21  2014. As one of three Natera executives in the IPO working group, Rosenman

22  reviewed and approved, and participated in making, statements in the Registration

23  Statement. He also reviewed, edited and approved the IPO's roadshow PowerPoint

24  presentation and roadshow talking points and script, in addition to participating in

25  making the false and misleading statements at the roadshow as Natera's CFO.

26  Rosenman was motivated by the financial implications of an IPO for Natera and its

27  then-private shareholders, including (but not limited to) officers and employees of the

28  Company.  Immediately before the IPO, defendant Rosenman beneficially owned

SHAREHOLDER CLASS ACTION COMPLAINT

1 Natera options for over 138,000 underlying marketable common shares with exercise
2 prices of $2.65 per share and an intrinsic value of over $2.1 million as of the IPO's
3 close.

4      13.    Defendant Roelof F. Botha has been a Natera director since 2007.
5 Defendant Botha is also Natera's Lead Independent Director and a member of
6 Natera's Audit Committee and Nominating and Corporate Governance Committee.
7 Immediately prior to the IPO, defendant Botha beneficially owned over 7.7 million, or
8 approximately 20%, of Natera's outstanding shares.  Those shares largely consisted of
9 Series A through Series E Preferred Stock, all of which converted to publicly tradable
10 common stock on a one-for-one basis in connection with and immediately prior to the
11 closing of the IPO.  All of these shares, constituting over $139 million in marketable
12 securities as a result of the IPO, were held by limited partnerships affiliated with the
13 Sequoia Capital venture capital firm.  Botha is affiliated with Sequoia Capital, and is
14 a Managing Member of defendant SC XII Management, LLC, the general partner of
15 defendant Sequoia Capital XII, LP and affiliated limited partnerships, and has (and
16 had at the time of the IPO) shared voting and dispositive power over the 7.7 million-
17 plus shares held by those limited partnerships.  Botha does business out of Sequoia
18 Capital offices in San Mateo County.

19      14.    Defendant Todd Cozzens has been a Natera director since 2011.
20 Defendant Cozzens is also a member of Natera's Audit Committee and Compensation
21 Committee.  Cozzens was with Sequoia Capital, the venture capital firm holding
22 approximately 20% of Natera's outstanding shares as of the IPO.  Defendant Cozzens
23 beneficially owned options for over 80,000 underlying marketable common shares with
24 exercise prices of $1.38 per share and an intrinsic value of over $1.3 million as of the
25 IPO's close.

26      15.    Defendant Edward C. Driscoll, Jr., also known as "Ted Driscoll," has been
27 a Natera director since 2007.  Defendant Driscoll is also a member of Natera's
28 Nominating and Corporate Governance Committee.  Since 2006, defendant Driscoll

SHAREHOLDER CLASS ACTION COMPLAINT

1   has been with Claremont Creek Ventures, a venture capital firm that held and
2   controlled approximately 19% of Natera's voting shares as of the IPO, and he sourced
3   and led the financing of Natera pre-IPO. Driscoll resides in San Mateo County.

4        16.     Defendant James I. Healy has been a Natera director since November
5   2014. Defendant Healy is also a member of the Compensation Committee and
6   Nominating and Corporate Governance Committee. Immediately prior to the IPO,
7   defendant Healy beneficially owned over 2.3 million, or approximately 6%, of Natera's
8   outstanding shares. Those shares largely consisted of Series F Preferred Stock, all of
9   which converted to publicly tradable common stock on a one-for-one basis in
10  connection with and immediately prior to the closing of the IPO. All of these shares,
11  constituting over $41 million in marketable securities as a result of the IPO, were held
12  by limited partnerships affiliated with the Sofinnova venture capital firm. Defendant
13  Healy is affiliated with Sofinnova, and is a managing member of each of Sofinnova
14  Management VIII, L.L.C. and Sofinnova Management IX, L.L.C., the general partners
15  of Sofinnova Venture Partners VIII, L.P. and Sofinnova Venture Partners IX, L.P.,
16  respectively. Those limited partnerships each held approximately 1.2 million shares of
17  Natera stock as of the IPO, and Healy has (and had at the time of the IPO) shared
18  voting and dispositive power over those shares.

19       17.     Defendant John Steuart has been a Natera director since June 2007.
20  Defendant Steuart is also a member of Natera's Audit Committee and Compensation
21  Committee. Defendant Steuart co-founded Claremont Creek Ventures, the venture
22  capital firm that held approximately 19% of Natera's shares as of the IPO, and he was
23  a Managing Director at that firm from 2004 to July 2012.

24       18.     The defendants named in ¶¶ 10-17 are sometimes referred to herein as
25  the "Individual Defendants." The Individual Defendants each participated in the
26  preparation of and signed the Registration Statement for the IPO. Their participation
27  in the solicitation of the IPO, through preparation and approval of the offering
28  documents, was motivated by each of their financial interests in the Company that

SHAREHOLDER CLASS ACTION COMPLAINT

1  were served by the IPO, and each of them financially benefited from the IPO in

2  numerous ways, including by substantially increasing the book value of Natera and

3  the Individual Defendants' shares and by providing a liquid market in which to sell

4  their shares upon the exercise of in-the-money options or otherwise. Indeed, the

5  employee stock options held by the defendants were valued in anticipation of an IPO.

6  Natera's directors and executive officers and ·their affiliates beneficially owned more

7  than 34% of the Company's outstanding stock after the IPO. In addition, the

8  defendants referenced above in ¶¶ 10-12 are executives of Natera and approved and

9  participated in making statements to pitch potential investors in the roadshow to sell

10  the IPO. Natera and the Individual Defendants who signed the Registration

11  Statement are strictly liable for the false and misleading statements incorporated into

12  the Registration Statement.

13      19.    Defendant SC XII Management, LLC is part of a venture capital firm

14  that invested in Natera prior to the IPO and, through affiliated limited partnerships it

15  controlled, including defendant Sequoia Capital XII, LP, beneficially owned over 20%

16  of the Company's shares as of the IPO.  (These two defendants are collectively referred

17  to herein as "Sequoia Capital.") Defendant Botha is a Managing Member of defendant

18  SC XII Management, LLC, the general partner of defendant Sequoia Capital XII, LP

19  and affiliated limited partnerships, and has (and had at the time of the IPO) shared

20  voting and dispositive power over the 7.7 million-plus shares held by those limited

21  partnerships.  By virtue of its 20% ownership of Natera and having two directors on

22  Natera's board of directors (defendants Botha and Cozzens) at the time of the IPO,

23  defendant Sequoia Capital effectively controlled Natera and caused it to conduct the

24  IPO.  Sequoia Capital has offices in San Mateo County.

25      20.    Defendant Lightspeed Ultimate General Partner VIII, Ltd. is part of a

26  venture capital firm that invested in Natera prior to the IPO and, through affiliated

27  limited partnerships it controlled, including defendant Lightspeed Venture Partners

28  VIII, LP, beneficially owned over 10% of the Company's shares as of the IPO.  (These

SHAREHOLDER CLASS ACTION COMPLAINT

1 | two defendants are collectively referred to herein as "Lightspeed.")  Lightspeed's
2 | shares included Series A-1 and Series B through Series E Preferred Stock, which all
3 | converted into publicly tractable Natera common stock on a one-for-one basis in
4 | connection with and immediately prior to the close of the IPO.  Defendant Lightspeed
5 | Venture Partners VIII, LP held approximately 10% of the Company's shares as of the
6 | IPO and defendant Lightspeed Ultimate General Partner VIII, Ltd. had the power to,
7 | and did, direct the voting of those Natera shares. By virtue of those holdings,
8 | Lightspeed effectively controlled Natera and caused it to market and conduct the IPO.
9 | Lightspeed has offices in San Mateo County.

10 |     21.    The defendants named in ¶¶ 19-20 are sometimes collectively referred to
11 | herein as the "Venture Capital Defendants."  The Venture Capital Defendants are
12 | identified as related parties to Natera in the Registration Statement.  By virtue of
13 | their ownership of convertible preferred stock and having directors on Natera's board
14 | of directors, the Venture Capital Defendants controlled Natera.

15 |     22.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an
16 | underwriter to Natera in connection with the IPO.

17 |     23.    Defendant Cowen and Company, LLC ("Cowen") served as an
18 | underwriter to Natera in connection with the IPO.

19 |     24.    Defendant Piper Jaffray & Co. ("Piper Jaffray") served as an underwriter
20 | to Natera in connection with the IPO.

21 |     25.    Defendant Robert W. Baird & Co. Incorporated ("Baird") served as an
22 | underwriter to Natera in connection with the IPO.

23 |     26.    Defendant Wedbush Securities Inc. ("Wedbush") served as an
24 | underwriter to Natera in connection with the IPO.

25 |     27.    Defendants Morgan Stanley, Cowen, Piper Jaffray, Baird and Wedbush
26 | (the "Underwriter Defendants)" are each financial services firms that acted as the lead
27 | and representative underwriters of Natera's IPO from their California-based offices,
28 | by helping to draft, approve the content of, and disseminate, the offering documents,

SHAREHOLDER CLASS ACTION COMPLAINT

1  by marketing the IPO, and by selling Natera's stock directly to investors per the

2  underwriting syndicate allocation of 4,000,000, 2,150,000, 2,150,000, 900,000, and

3  800,000 shares, respectively, not including the additional shares sold pursuant to the

4  underwriting syndicate's "greenshoe" option.  Morgan Stanley's offices are located in

5  San Mateo County, and the remaining Underwriter Defendants have offices in San

6  Francisco.  Pursuant to the Securities Act, the Underwriter Defendants (and Natera

7  where applicable) are liable for the false and misleading statements in the

8  Registration Statement as follows:

9       (a)    Pursuant to the Securities Act, the Underwriter Defendants are liable for

10  the false and misleading statements in the Offering's Registration Statement and

11  Prospectus.  The Underwriter Defendants' failure to conduct adequate due diligence

12  investigations was a substantial factor leading to the harm complained of herein.

13      (b)    The Underwriter Defendants are primarily investment banking houses

14  which specialize, *inter alia*, in underwriting public offerings of securities. They served

15  as the underwriters of the IPO and received approximately $13.7 million in fees,

16  including underwriting discounts and commissions from the Offering and greenshoe.

17  The Underwriter Defendants determined that in return for their share of the IPO

18  proceeds, they were willing to merchandize Natera common stock in the IPO.  The

19  Underwriter Defendants arranged a multi-city roadshow prior to the IPO during

20  which they and representatives from Natera directly invited investors to meetings and

21  webcasts for the purpose of encouraging investment in the IPO and pitched investors

22  who purchased shares in the IPO.  As the underwriters of the Offering, in addition to

23  their lucrative underwriting fees, they also received an option to purchase 1.5 million

24  additional shares of common stock at the public offering price, less underwriting

25  discounts and commissions; they exercised the option to purchase 900,000 additional

26  shares.

27      (c)    The Underwriter Defendants decided that in return for substantial fees

28  and an option to purchase 1.5 million shares, they were willing to underwrite and

-10-

SHAREHOLDER CLASS ACTION COMPLAINT

1  market Natera's common stock in the Offering.  The Underwriter Defendants met with

2  potential investors and presented highly favorable but materially incorrect and/or

3  materially misleading information about the Company, its business, products, plans,

4  and financial prospects, and/or omitted to disclose material information required to be

5  disclosed under the federal securities laws and applicable regulations promulgated

6  thereunder.

7        (d)     Representatives of the Underwriter Defendants also assisted Natera and

8  the Individual Defendants in planning the Offering. They also purported to conduct an

9  adequate and reasonable investigation into the business, operations, products and

10  plans of Natera, an undertaking known as a "due diligence" investigation.  During the

11  course of their "due diligence," the Underwriter Defendants had continual access to

12  confidential corporate information concerning Natera's business, financial condition,

13  products, plans and prospects.

14        (e)     In addition to having access to internal Natera corporate documents, the

15  Underwriter Defendants and/or their agents, including their counsel, had access to

16  Natera's lawyers, management, directors and top executives to determine: (i) the

17  strategy to best accomplish the Offering; (ii) the terms of the Offering, including the

18  price at which Natera common stock would be sold; (iii) the language to be used in the

19  Registration Statement; (iv) what disclosures about Natera would be made in the

20  Registration Statement; and (v) what responses would be made to the SEC in

21  connection with its review of the Registration Statement.  As a result of those constant

22  contacts and communications between the Underwriter Defendants' representatives

23  and Natera's management and top executives, at a minimum the Underwriter

24  Defendants should have known of Natera's undisclosed existing problems and plans,

25  and the material misstatements and omissions contained in the Registration

26  Statement as detailed herein.

27        (f)     The Underwriter Defendants caused the Registration Statement to be

28  filed with the SEC and to be declared effective in connection with offers and sales of

SHAREHOLDER CLASS ACTION COMPLAINT

1  Natera shares pursuant and/or traceable to the Offering and relevant offering
2  materials, including to plaintiff and the Class.

3     28.   The true names and capacities of defendants sued herein under
4  California Code of Civil Procedure §474 as Does 1 through 25, inclusive, are presently
5  unknown to plaintiff who therefore sues these defendants by such fictitious names.
6  Plaintiff will seek to amend this complaint and include these Doe defendants' true
7  names and capacities when they are ascertained.  Each of the fictitiously named
8  defendants is responsible in some manner for the conduct alleged herein and for the
9  injuries suffered by the Class.

10                    **FACTUAL BACKGROUND**
11  **Natera and Its Business**

12     29.   Natera seeks to develop and commercialize minimally or non-invasive
13  tests for the highly reliable detection of DNA variations covering a broad set of
14  diseases.

15     30.   Natera's method, called massively multiplexed polymerase chain reaction
16  ("mmPCR"), combines proprietary molecular biology and computational techniques to measure
17  genomic variations in tiny amounts of DNA.  The Company has developed computationally
18  intensive algorithms that combine the data generated by mmPCR with the ever-expanding set
19  of publicly available data on genetic variations. The Company has optimized these algorithms
20  to enable laboratories to run diagnostic tests locally and access Natera's algorithms in the
21  cloud.  Natera's tests detect copy number variations ("CNVs") and single nucleotide variants
22  ("SNVs").  A CNV is a genetic mutation in which relatively large regions of the genome have
23  been deleted or duplicated.  An SNV is a mutation where a single base has changed. When
24  single-base changes are common in the population, that position on the chromosome is called a
25  single nucleotide polymorphism ("SNP").

26     31.   The Company generates revenue primarily from the sale of Panorama,
27  its non-invasive prenatal test, or NIPT, which was launched in March 2013.

28     32.   Panorama revenues accounted for 56% and 73% of Natera's revenue in

SHAREHOLDER CLASS ACTION COMPLAINT

1   2013 and 2014, respectively.

2        33.     The Company claims that Panorama is the "most accurate NIPT

3   commercially available in the United States," and that its "specificity and sensitivity

4   reduce the need for unnecessary confirmatory invasive procedures, lowering the total

5   cost to the healthcare system of these procedures and limiting the resulting risk of

6   spontaneous miscarriage." Panorama non-invasively screens for fetal chromosomal

7   abnormalities, including Down syndrome, Edwards syndrome, Patau syndrome,

8   Turner syndrome and triploidy. Panorama can be performed as early as nine weeks

9   into a pregnancy, which is significantly earlier than traditional methods.

10        34.     In 2014, the Company enhanced Panorama by adding the capability to

11   screen for five of the most common genetic diseases caused by microdeletions, which,

12   according to data published in Prenatal Diagnosis and American Journal of Obstetrics

13   & Gynecology, are more common than Down syndrome for women younger than

14   approximately 32 years of age.[2] Unlike Down syndrome and other chromosomal

15   abnormalities, where risk increases with maternal age, the risk of these five

16   microdeletions is independent of maternal age. Stated differently, tests for fetal

17   chromosomal abnormalities tend to be performed primarily in high-risk pregnancies,

18   while tests for microdeletions can be performed in both high-risk pregnancies and

19   average-risk pregnancies. Natera estimated that in 2013 there were approximately

20   four million births in the United States, of which approximately 600,000 (or 15%) were

21   considered high risk. By expanding Panorama's use in pregnancies classified as

22   average risk, Natera supposedly would be able to greatly expand revenue.

23   ///

24   ///

25   ///

26   ///

27   _____

28      [2] Microdeletions are missing sub-chromosomal pieces of DNA, which can have serious health implications depending on the location of the deletion.

SHAREHOLDER CLASS ACTION COMPLAINT

35.     Natera's growth depended in large part on expanding Panorama's use in average- risk pregnancies because the high-risk pregnancy market was essentially fully penetrated:

| US Average Risk Test | | | | | |
|---|---|---|---|---|---|
| Company | 2012E | 2013E | 2014E | 2015E | 2016E |
| Sequenom | 200 | 1,490 | 4,860 | 6,320 | 7,040 |
| Ariosa | 797 | 5,374 | 6,000 | 6,400 | 6,750 |
| Illumina | 320 | 600 | 3,450 | 7,200 | 9,000 |
| LabCorp | | | 2,000 | 6,000 | 13,000 |
| Natera | 0 | 12,050 | 81,000 | 127,300 | 159,100 |
| TOTAL | 1,317 | 19,514 | 97,310 | 153,130 | 194,890 |
| % Low Risk Penetration | 0.1% | 0.9% | 4.4% | 7.0% | 8.9% |

*Assumes 2.2MM Average Risk tests in US is max. Based on industry checks and company projections.

36.     By contrast, the average-risk pregnancy market had barely been tapped:

| US Average Risk Test | | | | | |
|---|---|---|---|---|---|
| Company | 2012E | 2013E | 2014E | 2015E | 2016E |
| Sequenom | 62,729 | 149,000 | 162,000 | 174,440 | 172,480 |
| Ariosa | 26,550 | 102,101 | 95,000 | 25,000 | 35,000 |
| Illumina | 16,000 | 30,000 | 110,000 | 150,000 | 150,000 |
| LabCorp | | | 30,000 | 114,000 | 117,000 |
| Natera | 0 | 36,150 | 59,000 | 64,200 | 69,200 |
| TOTAL | 105,279 | 317,251 | 456,000 | 527,640 | 543,680 |
| % High Risk Penetration | 19% | 57% | 81% | 94% | 97% |

*Assumes 560k High Risk tests in US is max. Assumes theoretical max of 750k adjusted by 25% for low pre-natal care compliance

37.     Natera uses the number of tests accessioned as a key indicator to assess its business.[3]  Over 65,000 and 185,000 Panorama tests were accessioned during the years ended December 31, 2013 and 2014, respectively, and over 55,000 Panorama tests were accessioned during 1Q15.

38.     The Company acknowledged that its "ability to increase [its] revenues will depend on [its] ability to further penetrate the domestic and international markets and, in particular generate sales through [its] direct sales force, offer

---

[3] A test is accessioned when Natera receives the test, the relevant information about the test is entered into its computer system and the test sample is routed into the appropriate sample flow.

SHAREHOLDER CLASS ACTION COMPLAINT

1  additional tests, obtain reimbursement from additional third-party payers and

2  increase [its] reimbursement rate for tests performed."

3      39.    Natera's customers include independent laboratories, national and

4  regional reference laboratories, medical centers and physician practices.  The

5  Company markets and sells its tests both through its sales force and its laboratory

6  distributors.  Natera bills clinics, laboratory distribution partners, patients and

7  insurance payers for the tests the Company performs.  In cases where Natera bills

8  laboratory distribution partners, its partners in turn bill clinics, patients and

9  insurance payers.  Insurers reimburse for NIPT procedures in high-risk pregnancies

10  based on positive coverage decisions, which means that the insurer has determined

11  that NIPT in general is medically necessary for this category of patient.

12      40.    The Company attributed its commercial success and future growth

13  prospects in part to its independent direct sales force, which, at the time of the IPO,

14  Natera stated it was continuing to expand.  Indeed, Natera stated that "[w]e can offer

15  all of our products through our direct sales force and at a higher gross margin

16  percentage than when we service customers through a partner."  Natera also stated

17  that the "percentage of our overall accessioned tests generated through the higher

18  margin U.S. direct sales force increased from approximately 25% in 2013 to

19  approximately 44% in 2014, and to approximately 60% for the three months ended

20  March 31, 2015."

21  **Natera's Ownership and Compensation Plan**

22      41.    Before going public, Natera's directors and stockholders approved a 1-for-

23  1.63 reverse split of its capital stock on June 19, 2015.  Just before the Offering, the

24  Company had approximately 38.4 million shares of common stock outstanding. As of

25  July 31, 2015, there were 49.9 million shares of stock outstanding, 76.9% of which was

26  owned by existing stockholders before the IPO, and 23.1% of which was owned by new

27  investors.

28      42.    Before the IPO, none of the directors were compensated for service as a

SHAREHOLDER CLASS ACTION COMPLAINT

1   member of Natera's board of directors.  At the completion of the IPO, the directors

2   were each eligible to receive compensation for their service on the board of directors as

3   follows:

| Position | Retainer |
|---|---|
| Board Member | $35,000 |
| Lead Independent Director | $15,000 |
| Audit Committee Chair | $15,000 |
| Compensation Committee Chair | $12,000 |
| Nominating and Corporate Governance Committee Chair | $10,000 |
| Audit Committee Member | $7,500 |
| Compensation Committee Member | $6,000 |
| Nominating and Corporate Governance Committee Member | $5,000 |

43.   In addition to the retainer above, each director is eligible to receive an

annual stock option grant of 11,169 shares to be granted at Natera's annual

meeting of stockholders beginning in 2016.

## MATERIALLY FALSE AND MISLEADING
## REGISTRATION STATEMENT

44.   On July 2, 2015, Natera conducted its IPO, selling 10.9 million shares at

$18 per share and raising approximately $178.5 million in proceeds, including the

underwriters' exercise of the overallotment option.

45.   In the Registration Statement, the Company reported the following with

respect to its financial condition:

|  | FY2013 | FY2014 | % Change | 1Q14 | 1Q15 | % Change |
|---|---|---|---|---|---|---|
| Revenues | $55.1 million | $159.2 million | 188.7% | $27.2 million | $47.4 million | 73.8% |
| Net Loss | ($37.1 million) | ($5.1 million) | (86.1%) | ($9.6 million) | ($10 million) | 4% |

46.   Indeed, Natera portrayed itself as a "rapidly growing diagnostics

company" with huge year-over-year increases in revenues – purportedly of nearly

200%. The Company represented that its revenues were in a "quarterly" growth

"trend" and that its "rapid growth of revenues is attributed to reimbursement from

increased volumes of ... Panorama" – the Company's primary product. The

Registration Statement created the impression that gross margins were high and

SHAREHOLDER CLASS ACTION COMPLAINT

1  increasing, making such statements as "Panorama's test performance has allowed us

2  to command a price premium" while achieving a high volume of accessions, "increase[s

3  in] the number of tests distributed … in the third and fourth quarters of 2014 resulted

4  in a higher average payment per test," "average costs per unit decreased" in 2014, and

5  direct sales force sales were "at a higher gross margin percentage" and had increased

6  significantly.  The Registration Statement characterized the decrease in revenue and

7  increase in net loss in 1Q15 as not "a reliable indicator of our future results," also

8  suggesting it was merely due to "new CPT codes" that came into effect at the

9  beginning of the quarter and an associated "delay in revenue recognition," adding that

10  "not all payers may implement this code in a timely fashion." But the statements and

11  the reported financial results above were false and misleading and omitted material

12  information because sales of the Company's flagship product had flat-lined, Natera

13  was contracting at lower prices that were significantly shrinking revenues and gross

14  margin, and then-current (second quarter) results were far, far worse.

15       47.    In fact, revenues were soft and there was a huge net loss,

16  | | 2014 | 2015 | % Change |
17  | --- | --- | --- | --- |
    | Revenues | $35.8 million | $45 million | 25.8% |
    | Net Loss | ($514,000) | ($19.6 million) | 3.729%[1] |

18

19       48.    Natera's nearly $20 million net loss in 2Q15 exceeded any other

20  quarterly loss the Company had suffered by between almost 100% and 3700% since

21  at least 2Q13 when Panorama was released:

22  | | 2Q13 | 3Q13 | 4Q13 | 1Q14 | 2Q14 | 3Q14 | 4Q14 | 1Q15 | 2Q15 |
23  | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
    | Net Loss | ($8.9m) | ($5.5m) | ($4.7m) | ($9.6m) | ($514k) | ($3.7m) | ($1.2m) | ($10m) | ($19.6m) |

24       49.    Natera's 2Q15 revenue decline was also the second quarter in a row of

25  declining revenue:

26

27

28

SHAREHOLDER CLASS ACTION COMPLAINT



50.    With respect to Panorama, Natera's flagship NIPT product and key revenue driver, the Registration Statement portrayed it as being in a significant growth "trend," stated that large increases in revenues were "primarily due to increased sales of Panorama," and represented that quarterly and annual year-over-year increases in Panorama tests accessioned were increasing revenue greatly.

| | 2013 | 2014 | 1Q14 | 1Q15 |
|---|---|---|---|---|
| Panorama Tests Accessioned | 65,000+ | 185,000+ | 38,000+ | 55,000+ |

51.    The statements above were false and misleading and omitted material information. In fact, Panorama tests accessioned in which revenue was recognized had already flat-lined at 28,000+ tests, and the percent of Panorama tests accessioned in which revenue was recognized in the same quarter had dramatically declined to a mere 47%, as third-party payers were refusing to reimburse patients for Panorama adequately and doctors were not recommending it:

| | 2013 | 2014 | 1Q14 | 1Q15 | 2014 | 2015 |
|---|---|---|---|---|---|---|
| Panorama Tests Accessioned | 65,000+ | 185,000+ | 38,000+ | 55,000+ | 47,000+ | 58,000+ |
| Panorama Tests Accessioned and Revenue Recognized | 45,000+ | 121,000+ | 28,000+ | 28,000+ | 35,000+ | 28,000+ |
| % Accessioned in Same Quarter in Which Revenue Recognized | 100% | 94% | 78% | 57% | 74% | 47% |

52.    The Registration Statement referred to pages and pages of generalized "risks and uncertainties" that purportedly were then not occurring but if they "actually occur[red]," "could … materially and adversely affect[]" Natera.  But many of

SHAREHOLDER CLASS ACTION COMPLAINT

1   these statements were materially false and misleading and omitted material

2   then-current factual information. "Our quarterly results may fluctuate significantly,

3   which could adversely impact the value of our stock," "if our efforts to further increase

4   the use and adoption of Panorama … do not succeed, our business will be harmed,"

5   and the "NIPT market may not grow as we expect, and NIPTs may not gain

6   acceptance for use in the average-risk pregnancy population, which would limit the

7   market for Panorama," the Registration Statement impotently stated. Those

8   statements were false and misleading and omitted material information because

9   Natera was sitting on then-current bleak results from operations and constrained

10  guidance resulting therefrom that would certainly adversely impact Natera's stock

11  value, and indeed that was due in part to the flat-lining of Panorama test accessions,

12  price concessions, and factors limiting the market for Panorama, including third-party

13  payer refusals and doctor behavior.

14       53.   The Registration Statement asserted as a mere "uncertain[y]" that

15  "third-party payers, such as commercial insurance companies and government

16  insurance programs, **may** decide not to reimburse for Panorama, **may** not reimburse

17  for uses of Panorama for the average-risk pregnancy population or for the screening of

18  microdeletions, or **may** set the amounts of such reimbursements at prices that do not

19  allow us to cover our expenses." It also stated that "*[i]f* we are unable to expand

20  third-party payer coverage and reimbursement for Panorama and our other tests, *if*

21  third-party payers withdraw coverage or provide lower levels of reimbursement due to

22  changing policies, billing complexities or other factors, or *if* we are required to refund

23  any reimbursements already received, our revenues and results of operations would be

24  adversely affected." But these statements were false and misleading and omitted

25  material information because the purportedly merely "possible" future had already

26  arrived. Third-party payers were reducing reimbursement amounts and prices, even

27  those third-party payers that were contracting when coverage was previously out-of-

28  network were doing so at significantly reduced prices, and Natera could not offset this

SHAREHOLDER CLASS ACTION COMPLAINT

1   with expanded coverage and reimbursement, and the results were damning to the

2   Company as reflected in the then-current (but not revealed) 2Q15 results.

3       54.     Similarly, the Registration Statement stated insurance coverage was

4   "expanding," but *"[i]f* we are unable to obtain or maintain adequate reimbursement

5   coverage from third-party payers" or *"if* reimbursement coverage is unavailable or

6   reimbursement amounts are inadequate," "physicians *may* be reluctant to order the

7   use of our tests" in the future and "results from operations and prospects could be

8   materially and adversely affected."  Likewise, it stated: *"If* adequate third-party

9   reimbursement is unavailable, we *may* not be able to maintain price levels," *"[i]f* we

10  are successful in entering into additional contractual arrangements with commercial

11  third-party payers ... the amount of overall reimbursement we receive may decrease

12  *if*, as we would expect, we are reimbursed less money per test at a contracted rate

13  than at a non-contracted rate, which *could* have a negative impact on our revenue,"

14  *"if* we do have written agreements regarding reimbursement ... those agreements are

15  not guarantees of reimbursement coverage in an adequate amount," and "third-party

16  payers *may* review and adjust the rate of reimbursement." In addition, the

17  Registration Statement stated "not all payers *may* implement" a new CPT code "in a

18  timely fashion, and reimbursement *may* be less than we have received in the past."

19  All of the statements above were false and misleading and omitted material

20  information.  In truth, these events were already occurring and already having a

21  significant negative effect on the Company's revenues, margins and prospects. Indeed,

22  Natera's prices were then going down as a result of contracts with third-party payers

23  and third-party payer reimbursement coverages, amounts and negotiated price levels.

24  There *were* payers that were in fact implementing the new CPT code in such a way

25  that reimbursement *was* in fact less than what Natera had been historically receiving.

26      55.     The information misrepresented and omitted by defendants in the

27  Registration Statement was material. Even securities analysts employed by the

28  Underwriter Defendants professed surprise at the decline in gross margins for the

SHAREHOLDER CLASS ACTION COMPLAINT

quarter that ended over one week before the IPO closed.  When Natera began to reveal these facts just weeks after the IPO, analysts made comments such as: *"Surprisingly [gross margins] were flattish despite significantly more NIPTs and sequentially down sales*." Another analyst referred to it as *"a pretty big step down* in the second half in terms of gross margin." And when securities analysts pressured the Company's executives in Natera's first earnings call, suggesting other companies had been more forthcoming about reimbursement levels, Natera's executives got defensive, finally admitting Natera had "been *under pressure since the coding change [b]eginning in January of 2015, it hurt.*" Even so, Natera executives continued to try and down play the significance of their gross margin declines, emphasizing volume increases and efforts to decrease cost of goods sold.  But the Company later admitted margin declines were more significant than they had previously suggested, with analysts describing the declines, for example, as *"a big step down in the fourth quarter*." Likewise, as it was revealed that the Company was lowering its top-end revenue guidance, that future growth was not as telegraphed in the IPO, and that revenues and margins were being affected by third-party payer contract reimbursement levels and pricing declines, investors reacted negatively.

56.    Natera's Registration Statement, including the Prospectus incorporated therein, presented a highly positive picture of the Company's business, performance, prospects and products, while omitting these known trends and facts that had already had a materially unfavorable impact on Natera's revenues and net losses at the time of the IPO. *See* Item 303 of SEC Reg. S-K, 17 C.F.R. §229.303(a)(3)(ii) (requiring that the materials incorporated in a registration statement disclose all "known trends or uncertainties" reasonably expected to have a material, unfavorable impact on a company's operations). As a result of the foregoing herein and alleged above, the Company would not be able to meet previously stated guidance regarding results from operations.

57.    The IPO was a success for the Company and the Underwriter

SHAREHOLDER CLASS ACTION COMPLAINT

1  Defendants, who sold 10.9 million shares of Natera common stock to the public at $18

2  per share (including 900,000 shares of common stock sold pursuant to the Underwriter

3  Defendants' exercise of the over-allotment option) raising $178.5 million in gross

4  proceeds for the Company.

5      58.    At the time of the filing of this action, Natera stock was trading in the

6  range of $6.50-$7.00 per share, or less than half of the IPO price, having plummeted in

7  response to information reflecting the materialization of significant risks

8  misrepresented and omitted from the Registration Statement as alleged herein, and to

9  the partial revelation of material facts previously omitted and misrepresented as

10  alleged herein.

11                **CLASS ACTION ALLEGATIONS**

12      59.    Plaintiff brings this action under California Code of Civil Procedure §382

13  as a class action on behalf of a class consisting of all purchasers of Natera common

14  stock in and/or traceable to the Company's IPO and who were damaged thereby (the

15  "Class"). Excluded from the Class are defendants and their families, the officers and

16  directors of the Company at all relevant times, members of their immediate families

17  and their legal representatives, heirs, successors or assigns and any entity in which

18  defendants have or had a controlling interest.

19      60.    The members of the Class are so numerous that joinder of all members is

20  impracticable. According to the Company's most recent Form 10-Q, there were more

21  than 49.9 million shares of Natera common stock outstanding as of October 30, 2015.

22  While the exact number of Class members is unknown to plaintiff at this time and can

23  only be ascertained through appropriate discovery, plaintiff believes that there are

24  hundreds or thousands of members of the proposed Class. The members of the

25  proposed Class may be identified from records maintained by Natera or its transfer

26  agent and may be notified of the pendency of this action by mail, using customary

27  forms of notice that are commonly used in securities class actions.

28      61.    Plaintiff's claims are typical of the claims of the members of the Class as

SHAREHOLDER CLASS ACTION COMPLAINT

1 | all members of the Class are similarly affected by defendants' wrongful conduct.

2 |      62.    Plaintiff will fairly and adequately protect the interests of the members of
3 | the Class and has retained counsel competent and experienced in class and securities
4 | litigation.

5 |      63.    Common questions of law and fact exist as to all members of the Class
6 | and predominate over any questions solely affecting individual members of the Class.
7 | Among the questions of law and fact common to the Class are:

8 |      (a)    whether the federal securities laws were violated by defendants' acts as
9 |      alleged herein;

10 |      (b)    whether the Registration Statement and Prospectus contained materially
11 |      false and misleading statements and omissions; and

12 |      (c)    to what extent plaintiff and members of the Class have sustained
13 |      damages and the proper measure of damages.

14 |      64.    A class action is superior to all other available methods for the fair and
15 | efficient adjudication of this controversy since joinder of all members is impracticable.
16 | Furthermore, as the damages suffered by individual Class members may be relatively
17 | small, the expense and burden of individual litigation make it impossible for members
18 | of the Class to individually redress the wrongs done to them.  There will be no
19 | difficulty in the management of this action as a class action.

20 |
21 |

**FIRST CAUSE OF ACTION**
**Violations of §11 of the Securities Act**
**Against All Defendants Except the Venture Capital Defendants**

22 |      65.    Plaintiff repeats and realleges each and every allegation contained above,
23 | as if fully set forth herein.

24 |      66.    This Cause of Action is brought pursuant to §11 of the Securities Act, 15
25 | U.S.C. §77k, on behalf of the Class, against all defendants except the Venture Capital
26 | Defendants. This is a non-fraud cause of action. Plaintiff does not assert that
27 | defendants committed intentional or reckless misconduct or that defendants acted
28 | with scienter or fraudulent intent.

1  67.  The Registration Statement for the IPO was inaccurate and misleading,

2  contained untrue statements of material facts, omitted to state other facts necessary to

3  make the statements made therein not misleading, and omitted to state material facts

4  required to be stated therein.

5  68.  The defendants named in this Cause of Action are strictly liable to

6  plaintiff and the Class for the misstatements and omissions.

7  69.  None of the defendants named herein made a reasonable investigation or

8  possessed reasonable grounds for the belief that the statements contained in the

9  Registration Statement were true and without omissions of any material facts and

10  were not misleading.

11  70.  By reason of the conduct alleged herein, each of these defendants

12  violated, and/or controlled a person who violated, §11 of the Securities Act.

13  71.  Plaintiff acquired Natera common stock pursuant and/or traceable to the

14  IPO.

15  72.  Plaintiff and the Class have sustained damages. The value of Natera

16  common stock has declined substantially subsequent to and due to these defendants'

17  violations.

18  73.  At the time of their purchases of Natera common stock, plaintiff and

19  other members of the Class were without knowledge of the facts concerning the

20  wrongful conduct alleged herein and could not have reasonably discovered those facts

21  prior to the disclosures herein.  Less than one year has elapsed from the time that

22  plaintiff discovered or reasonably could have discovered the facts upon which this

23  complaint is based to the time that plaintiff commenced this action.  Less than three

24  years has elapsed between the time that the securities upon which this Cause of

25  Action is brought were offered to the public and the time plaintiff commenced this

26  action.

27

28

SHAREHOLDER CLASS ACTION COMPLAINT

1

**SECOND CAUSE OF ACTION**
**Violations of §12(a)(2) of the Securities Act**

2

**Against All Defendants Except the Venture Capital Defendants**

3      74.     Plaintiff repeats and realleges each and every allegation contained above,

4    as if fully set forth herein.

5      75.     This Cause of Action is brought pursuant to §12(a)(2) of the Securities

6    Act, 15 U.S.C. §77l(a)(2), against all defendants except the Venture Capital

7    Defendants.  This is a non-fraud cause of action. Plaintiff does not assert that

8    defendants committed intentional or reckless misconduct or that defendants acted

9    with scienter or fraudulent intent. The defendants named in this Cause of Action sold

10   Natera stock or were directly involved in the sale of Natera stock by approving

11   statements made in the Prospectus and roadshow that encouraged investment in the

12   IPO, and in so doing were motivated by a desire to serve their own financial interests

13   or the financial interests of the pre-IPO owners of Natera stock.

14     76.     By means of the defective Prospectus and other conduct alleged herein,

15   Natera, the Individual Defendants and the Underwriter Defendants promoted and

16   sold Natera common stock to plaintiff and other members of the Class.  The

17   defendants named in this Cause of Action were sellers, offerers and/or solicitors of

18   purchasers of the Natera stock offered pursuant to the Offering. Defendants issued,

19   caused to be issued and/or signed the Registration Statement issued in connection

20   with the Offering.  The Prospectus was used to induce investors, such as plaintiff and

21   the other members of the Class, to purchase Natera shares.

22     77.     The Prospectus and roadshow communications contained untrue

23   statements of material fact, and/or concealed or failed to disclose material facts, as

24   detailed above. The defendants named in this Cause of Action owed plaintiff and the

25   other members of the Class who purchased Natera common stock pursuant to the

26   Prospectus the duty to make a reasonable and diligent investigation of the statements

27   contained in the Prospectus to ensure that such statements were true and that there

28   was no omission to state a material fact required to be stated in order to make the

- 25 -

SHAREHOLDER CLASS ACTION COMPLAINT

1  statements contained therein not misleading.These defendants, in the exercise of

2  reasonable care, should have known of the misstatements and omissions contained in

3  the Prospectus as set forth above.

4      78.    Plaintiff did not know, nor in the exercise of reasonable diligence could

5  have known, of the untruths and omissions contained in the Prospectus at the time

6  plaintiff acquired Natera common stock.

7      79.    By reason of the conduct alleged herein, these defendants violated

8  §12(a)(2) of the Securities Act.  As a direct and proximate result of such violation,

9  plaintiff and the other members of the Class who purchased Natera common stock

10  pursuant to the Prospectus sustained substantial damages in connection with their

11  purchases of the stock.  Accordingly, plaintiff and the other members of the Class who

12  hold the common stock issued pursuant to the Prospectus have the right to rescind

13  and recover the consideration paid for their shares, and hereby tender their common

14  stock to defendants sued herein.  Class members who have sold their common stock

15  seek damages to the extent permitted by law.

16                        **THIRD CAUSE OF ACTION**
                   **For Violation of §15 of the Securities Act**
17          **Against All Defendants Except the Underwriter Defendants**

18      80.    Plaintiff repeats and realleges each and every allegation contained above,

19  as if fully set forth herein.

20      81.    This Cause of Action is brought pursuant to §15 of the Securities Act

21  against all defendants except the Underwriter Defendants.

22      82.    The Individual Defendants were each control persons of Natera by virtue

23  of their positions as directors and/or senior officers of Natera.  By virtue of pre-IPO

24  shareholder agreements, their stock holdings, and having designees on the Natera

25  board of directors at the time of the IPO, the Venture Capital Defendants had the

26  power to (and did) control Natera.  The Individual Defendants each had a series of

27  direct and/or indirect business and/or personal relationships with other directors

28  and/or officers and/or major shareholders of Natera.  Sequoia Capital controlled its

SHAREHOLDER CLASS ACTION COMPLAINT

1 | designees on Natera's board, Botha and Cozzens, who are defendants named herein.

2 | Those designees, Botha and Cozzens, and Healy, were controlled by Sequoia Capital

3 | and Lightspeed, respectively.  The Company controlled the Individual Defendants and

4 | all of Natera's employees.

5 |       83.    The Venture Capital Defendants had a financial interest in taking the

6 | Company's stock public to increase the holding value and marketability of their

7 | entities and their investments in Natera.  Natera, the Venture Capital Defendants

8 | and the Individual Defendants each were critical to effecting the IPO, based on their

9 | signing or authorization of the signing of the Registration Statement, by voting

10 | (including voting their shares) to execute the IPO, and having otherwise directed

11 | through their authority the processes leading to execution of the IPO.

12 | **PRAYER FOR RELIEF**

13 |     WHEREFORE, plaintiff prays for relief and judgment as follows:

14 |     A.    Determining that this action is a proper class action, certifying plaintiff

15 | as a Class representative under California Rule of Court 3.764 and California Code of

16 | Civil Procedure §382, and plaintiff's counsel as Class counsel;

17 |     B.    Awarding compensatory damages in favor of plaintiff and the Class

18 | against all defendants, jointly and severally, for all damages sustained as a result of

19 | defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

20 |     C.    Awarding plaintiff and the Class rescission or a rescissory measure of

21 | damages on their §12(a)(2) claims;

22 |     D.    Awarding plaintiff and the Class pre-judgment and post-judgment

23 | interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and

24 | disbursements; and

25 |     E.    Awarding such equitable/injunctive or other relief as deemed appropriate

26 | by the Court.

27 | ///

28 | ///

SHAREHOLDER CLASS ACTION COMPLAINT

1

<div align="center">**JURY DEMAND**</div>

2    Plaintiff demands a trial by jury.

3  DATED:  March 10, 2016        Respectfully submitted,

4                     BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr.

5                     Albert Y. Chang
Yury A. Kolesnikov

6

7                     Francis A. Bottini, Jr.

8

9                     7817 Ivanhoe Avenue, Suite 102
La Jolla, California  92037

10                   Telephone:  (858) 914-2001
Facsimile:   (858) 914-2002

11                   E-mail:      fbottini@bottinilaw.com
achang@bottinilaw.com

12                                 ykolesnikov@bottinilaw.com

13

14                     *Attorneys for Plaintiff*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<div align="center">- 28 -</div>

SHAREHOLDER CLASS ACTION COMPLAINT

CM-01

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:<br>BOTTINI & BOTTINI, INC.<br>Francis A. Bottini, Jr. (SBN 175783)<br>Yury A. Kolesnikov (SBN 271173)<br>7817 Ivanhoe Avenue, Suite 102, La Jolla, California 92037<br>TELEPHONE NO.: (858) 914-2001　FAX NO.: (858) 914-2002<br>ATTORNEY FOR *(Name)*: Plaintiff, Mika Cahoj | FOR COURT USE ONLY<br><br>**FILED**<br>**SAN MATEO COUNTY**<br><br>MAR 1 0 2016<br><br>Clerk of the Superior Court<br>By _____<br>DEPUTY CLERK |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  San Mateo
STREET ADDRESS: 400 County Center, Fourth Floor
MAILING ADDRESS:
CITY AND ZIP CODE: Redwood City, California 94063-1655
BRANCH NAME: Hall of Justice and Records

CASE NAME:
Cahoj v. Natera, Inc., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER:<br>C I V 5 3 7 7 1 7 |
|---|---|---|---|---|
| [✓] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter　[ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation<br>(Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| [ ] Auto (22)<br>[ ] Uninsured motorist (46) | [ ] Breach of contract/warranty (06)<br>[ ] Rule 3.740 collections (09)<br>[ ] Other collections (09)<br>[ ] Insurance coverage (18)<br>[ ] Other contract (37) | [ ] Antitrust/Trade regulation (03)<br>[ ] Construction defect (10)<br>[ ] Mass tort (40)<br>[✓] Securities litigation (28)<br>[ ] Environmental/Toxic tort (30) |
| **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**<br>[ ] Asbestos (04)<br>[ ] Product liability (24)<br>[ ] Medical malpractice (45)<br>[ ] Other PI/PD/WD (23) | **Real Property**<br>[ ] Eminent domain/Inverse condemnation (14)<br>[ ] Wrongful eviction (33)<br>[ ] Other real property (26) | [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)<br>**Enforcement of Judgment**<br>[ ] Enforcement of judgment (20) |
| **Non-PI/PD/WD (Other) Tort**<br>[ ] Business tort/unfair business practice (07)<br>[ ] Civil rights (08)<br>[ ] Defamation (13)<br>[ ] Fraud (16)<br>[ ] Intellectual property (19)<br>[ ] Professional negligence (25)<br>[ ] Other non-PI/PD/WD tort (35) | **Unlawful Detainer**<br>[ ] Commercial (31)<br>[ ] Residential (32)<br>[ ] Drugs (38)<br>**Judicial Review**<br>[ ] Asset forfeiture (05)<br>[ ] Petition re: arbitration award (11)<br>[ ] Writ of mandate (02) | **Miscellaneous Civil Complaint**<br>[ ] RICO (27)<br>[ ] Other complaint *(not specified above)* (42)<br>**Miscellaneous Civil Petition**<br>[ ] Partnership and corporate governance (21)<br>[ ] Other petition *(not specified above)* (43) |
| **Employment**<br>[ ] Wrongful termination (36)<br>[ ] Other employment (15) | [ ] Other judicial review (39) | |

2. This case [✓] is [ ] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [✓] Large number of separately represented parties　　d. [✓] Large number of witnesses
   b. [✓] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve　　e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. [✓] Substantial amount of documentary evidence　　f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a.[✓] monetary　b.[✓] nonmonetary; declaratory or injunctive relief　c.[ ] punitive
4. Number of causes of action *(specify)*: 3
5. This case [✓] is [ ] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

BY FAX

Date: March 10, 2016

Francis A. Bottini, Jr.
_____ (TYPE OR PRINT NAME)　　　　　　　　　　(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |

| | |
|---|---|
| Attorney or Party without Attorney (Name/Address):<br>Francis A. Bottini, Jr. (SBN: 175783)<br>Bottini & Bottini, Inc.<br>7817 Ivanhoe Avenue, Suite 102<br>La Jolla, California 92037<br>Telephone: (858) 914-2001<br>Attorney for Plaintiff | FOR COURT USE ONLY<br><br>F I L E D<br>SAN MATEO COUNTY<br><br>MAR 1 0 2016<br><br>Clerk of the Superior Court<br>By _____<br>DEPUTY CLERK |
| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF SAN MATEO<br>400 COUNTY CENTER<br>REDWOOD CITY, CA 94063 | |
| Plaintiff<br>Mika Cahoj | |
| Defendants<br>Natera, Inc., et al. | |
| **Certificate Re Complex Case Designation** | Case Number<br>**C I V 5 3 7 7 1 7** |

## This certificate must be completed and filed with your Civil Case Cover Sheet if you have checked a Complex Case designation or Counter-Designation

BY FAX

1.    In the attached Civil Case Cover Sheet, this case is being designated or counter-designated as a complex case [or as not a complex case] because at least one or more of the following boxes has been checked:

☒ Box 1 – Case type that is best described as being provisionally complex civil litigation (i.e., antitrust or trade regulation claims, construction defect claims involving many parties or structures, securities claims or investment losses involving many parties, environmental or toxic tort claims involving many parties, claims involving mass torts, or insurance coverage claims arising out of any of the foregoing claims).

☒ Box 2 – Complex due to factors requiring exceptional judicial management

☒ Box 5 – Is a class action suit.

2.    This case is being so designated based upon the following supporting information [including, without limitation, a brief description of the following factors as they pertain to this particular case: (1) management of a large number of separately represented parties; (2) complexity of anticipated factual and/or legal issues; (3) numerous pretrial motions that will be time-consuming to resolve; (4) management of a large number of witnesses or a substantial amount of documentary evidence; (5) coordination with related actions

pending in one or more courts in other counties, states or countries or in a federal court;
(6) whether or not certification of a putative class action will in fact be pursued; and (7)
substantial post-judgment judicial supervision]:

This case is provisionally complex as it involves security claims.  In addition,

it is being designated complex due to the large number of parties, the complexity of

factual and/or legal issues and because certification of a putative class will be

pursued.

*(attach additional pages if necessary)*

3.    Based on the above-stated supporting information, there is a reasonable basis for the complex
      case designation or counter-designation [or noncomplex case counter-designation] being made
      in the attached Civil Case Cover Sheet.

*****

I, the undersigned counsel or self-represented party, hereby certify that the above is true and correct
and that I make this certification subject to the applicable provisions of California Code of Civil
Procedure, Section 128.7 and/or California Rules of Professional Conduct, Rule 5-200 (B) and San
Mateo County Superior Court Local Rules, Local Rule 2.30.

Dated:   March 10, 2016

Francis A. Bottini, Jr.
[Type or Print Name]                    [Signature of Party or Attorney For Party]

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

| |
|---|
| **FOR COURT USE ONLY**<br>**(SOLO PARA USO DE LA CORTE)**<br><br>**F I L E D**<br>**SAN MATEO COUNTY**<br><br>MAR 1 0 2016<br><br>Clerk of the Superior Court<br>By _____<br>DEPUTY CLERK |

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**

NATERA, INC., MATTHEW RABINOWITZ, JONATHAN SHEENA,
[Additional Parties Attachment Form is attached]

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**

MIKA CAHOJ, Individually and on Behalf of All Others Similarly
Situated,

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>(El nombre y dirección de la corte es):<br><br>Superior Court of California, County of San Mateo<br>400 County Center, Fourth Floor, Redwood City, California 94063-1655 | **CASE NUMBER:**<br>(Número del Caso)<br>**C I V 5 3 7 7 1 7** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):

BOTTINI & BOTTINI, INC., 7817 Ivanhoe Avenue, Suite 102, La Jolla, California 92037          **BY FAX**

| | | | |
|---|---|---|---|
| DATE:<br>(Fecha) | MAR 1 0 2016 | RODINA M. CATALANO Clerk, by _____<br>(Secretario) | , Deputy<br>(Adjunto) |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):

3. ☐ on behalf of (specify):

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other (specify):
4. ☐ by personal delivery on (date):

Page 1 of 1

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Cahoj v. Natera, Inc., et al. | |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff     ☑ Defendant     ☐ Cross-Complainant     ☐ Cross-Defendant

HERM ROSENMAN, ROELOF F. BOTHA, TODD COZZENS, EDWARD C. DRISCOLL, JR., JAMES I. HEALY, JOHN STEUART, SC XII MANAGEMENT, LLC, SEQUOIA CAPITAL XII, LP, LIGHTSPEED ULTIMATE GENERAL PARTNER VIII, LTD., LIGHTSPEED VENTURE PARTNERS VIII, LP, MORGAN STANLEY & CO. LLC, COWEN AND COMPANY, LLC, PIPER JAFFRAY & CO., ROBERT W. BAIRD & CO. INCORPORATED, WEDBUSH SECURITIES INC., and DOES 1-25, inclusive,

Page __1__ of __1__

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**



**Superior Court of California**
**County of San Mateo**
**Civil Department**
**400 County Center**
**Redwood City, CA  94063-1655**
**(650) 261-5100**
**www.sanmateocourt.org**

| MIKA CAHOJ<br>Plaintiff(s)<br>vs.<br>NATERA, INC<br>Defendant(s) | **Notice of Complex Case Status Conference**<br><br>Case No.: CIV 537717       Date: **05/10/16**<br><br>Time:  **9:00 AM**<br><br>**Dept. 11** |
|---|---|
| Title:   MIKA CAHOJ VS NATERA, INC., ETAL | |

You are hereby given notice of your Complex Case Status Conference.  The date, time and department have been written above.  At this conference, the Presiding Judge will decide whether this action is a complex case within the meaning of California Rules of Court ("CRC"), Rule 3.400, subdivision (a) and whether it should be assigned to a single judge for all purposes.

1.  In accordance with applicable **San Mateo County Local Rule 2.30**, you are hereby ordered to:
    a.  **Serve** copies of this notice, your Civil Case Cover Sheet, and your Certificate Re: Complex Case Designation on all named parties in this action no later than service of your first appearance pleadings
    b.  **Give reasonable notice** of the Complex Case Status Conference to all named parties in this action, even if they have not yet made a first appearance or been formally served with the documents listed in subdivision (a).  Such notice shall be given in the same manner as required for an ex parte application pursuant to CRC 3.1203.

2.  **If you fail to follow the orders above, you are ordered to show cause why you should not be sanctioned.  The Order To Show Cause hearing will be at the same time as the Complex Case Status Conference.  Sanctions may include monetary, evidentiary or issue sanctions as well as striking pleadings and/or dismissal.**

3.  An action is provisionally a complex case if it involves one or more of the following types of claims: (1) antitrust or trade regulation claims; (2) construction defect claims involving many parties or structures; (3) securities claims or investment losses involving many parties; (4) environmental or toxic tort claims involving many parties; (5) claims involving massive torts; (6) claims involving class actions; or (7) insurance coverage claims arising out of any of the claims listed in subdivisions (1) through (6).  The Court shall treat a provisionally complex action as a complex case until the Presiding Judge has the opportunity to decide whether the action meets the definition in CRC 3.400(a).

4.  Any party who files either a Civil Case Cover Sheet (pursuant to CRC 3.401) or a counter or joinder Civil Case Cover Sheet (pursuant to CRC 3.402, subdivision (b) or (c)), designating an action as a complex case in Items 1, 2 and/or 5, must also file an accompanying Certificate Re: Complex Case Designation in the form prescribed by the Court.  The certificate must include supporting information showing a reasonable basis for the complex case designation being sought.  Such supporting information may include, without limitation, a brief

description of the following factors as they pertain to the particular action: (1) management of a large number of separately represented parties; (2) complexity of anticipated factual and/or legal issues; (3) numerous pretrial motions that will be time-consuming to resolve; (4) management of a large number of witnesses or a substantial amount of documentary evidence; (5) coordination with related actions pending in one or more courts in other counties, states or countries or in a federal court; (6) whether or not certification of a putative class action will in fact be pursued; and (7) substantial post-judgment judicial supervision.

For further information regarding case management policies and procedures, see the court website at www.sanmateocourt.org

* Telephonic appearances at Complex Case Status Conference are available by contacting CourtCall, LLC, an independent vendor, at least 5 business days prior to the scheduled conference.


## CLERK'S CERTIFICATE OF MAILING

I hereby certify that I am the clerk of this Court, not a party to this cause; that I served a copy of this notice on the below date, by placing a copy thereof in separate sealed envelopes addressed to the address shown by the records of this Court, and by then sealing said envelopes and depositing same, with postage fully pre-paid thereon, in the United States Mail at Redwood City, California.

Date: 03/10/16

Rodina M. Catalano,
Court Executive Officer/Clerk

By: UNALOTO FINAU
Deputy Clerk

Copies mailed to:

```
FRANCIS A BOTTINI
7817 IVANHOE AVENUE
SUITE 102
LA JOLLA CA 92037
```

## NOTICE OF CASE MANAGEMENT CONFERENCE

MIKA CAHOJ

vs.

NATERA, INC., ET. AL.

**FILED**
**SAN MATEO COUNTY**

MAR 1 0 2016

Clerk of the Superior Court

By _____
DEPUTY CLERK

Case No: **CIV537717**

Date: **6/2/2016**

Time 9:00 a.m.

Dept. **21** --on Tuesday & Thursday

Dept. _____ --on Wednesday & Friday

You are hereby given notice of your Case Management Conference. The date, time and department have been written above.

1. In accordance with applicable California Rules of the Court and local Rules 2.3(d)1–4 and 2.3(m), you are hereby ordered to:
    a) Serve all named defendants and file proofs of service on those defendants with the court within 60-days of filing the complaint (CRC 201.7).
    b) Serve a copy of this notice, Case Management Statement and ADR Information Sheet on all named parties in this action.
    c) File and serve a completed Case Management Statement at least 15-days before the Case Management Conference [CRC 212(g)]. Failure to do so may result in monetary sanctions.
    d) Meet and confer, in person or by telephone, to consider each of the issues identified in CRC 212(f) no later than 30-days before the date set for the Case Management Conference.
2. If you fail to follow the orders above, you are ordered to show cause why you should not be sanctioned. The Order to Show Cause hearing will be at the same time as the Case Management Conference hearing. Sanctions may include monetary, evidentiary or issue sanctions as well as striking pleadings and/or dismissal.
3. Continuances of Case Management Conferences are highly disfavored unless good cause is shown.
4. Parties may proceed to an appropriate dispute resolution process ("ADR") by filing a Stipulation to ADR and Proposed Order (see attached form). If plaintiff files a Stipulation to ADR and Proposed Order electing to proceed to judicial arbitration, the Case Management Conference will be taken off the court calendar and the case will be referred to the Arbitration Administrator. If plaintiffs and defendants file a completed stipulation to another ADR process (e.g., mediation) 10–days prior to the first scheduled Case Management Conference, the Case Management Conference will be continued for 90-days to allow parties time to complete their ADR session. The court will notify parties of their new Case Management Conference date.
5. If you have filed a default or a judgment has been entered, your case is not automatically taken off Case Management Conference Calendar. If "Does", "Roes", etc. are named in your complaint, they must be dismissed in order to close the case. If any party is in bankruptcy, the case is stayed only as to that named party.
6. You are further ordered to appear in person* (or through your attorney of record) at the Case Management Conference noticed above. You must be thoroughly familiar with the case and fully authorized to proceed.
7. The Case Management judge will issue orders at the conclusion of the conference that may include:
    a) Referring parties to voluntary ADR and setting an ADR completion date;
    b) Dismissing or severing claims or parties;
    c) Setting a trial date.
8. The Case Management judge may be the trial judge in this case.

For further information regarding case management policies and procedures, see the court's website at: www.sanmateocourt.org

*Telephonic appearances at case management conferences are available by contacting CourtCall, LLC, an independent vendor, at least five business days prior to the scheduled conference (see attached CourtCall information).